Case No. 21-1123, et al., Viasat, Inc., Avalance v. Federal Communications Commission Mr. Jay for the Avalance, Viasat, Inc., and Avalance Group Mr. Michalikoulos for the Avalance Dish Network Corporation Mr. Karn for the FOE, Issues Raised by Dish Network Ms. May for the FOE, Issues Raised by Viasat Mr. Shaw for the Intervenor Good morning, Your Honors, and may it please the Court I'm William Jay on behalf of Viasat and the Avalance Group As the FCC itself said, SpaceX's megaconstellation is unprecedented, and so are its foreseeable environmental consequences Most significantly, the alumina that will be produced by burning up in the atmosphere all 10,000 satellites that will be launched and then deorbited over 15 years Only a short time into that 15-year term, Starlink is already causing injury to, among others, individual astronomers like our declarant, Dr. Bedilli The FCC does not even dispute that Dr. Bedilli would have standing in his own right His membership in the Avalance Group is sufficient, all by itself, to give this Court jurisdiction to review the FCC's decision And on review I ask you about that because, um, what evidence in the record is there about how one becomes a member of the Avalance Group? What evidence in the record is there about whether members take dues? What evidence in the record is there about how the Avalance Group is funded? Okay, so I didn't hear the second part of your question I heard how you become a member and how the Avalance Group is funded, and I could not hear the middle part Whether members pay dues Whether members pay dues So let me address those in turn So, the Avalance Group has members And the declaration attached to our reply brief establishes that it not only does it have members now It has had members for well before this appeal was filed A person becomes a member of the Avalance Group by enrolling online It does not charge dues That's not required for it to be a membership association There are many examples of membership associations that are voluntary associations that don't charge their members dues But that are, like the Avalance Group, a forum for individuals to come together to advocate as a group And no one has disputed that the issues here are germane to the Avalance Group's mission The only question that the FCC has raised is whether it is a membership association A membership association in the traditional sense And it is Is there any evidence in the record about how officers of the Avalance Group are elected or selected? There is not Again, I don't think that that's ever been part of the test for a genuine membership association And I would point you to the First Circuit's decision in Students for Fair Admissions Which in considering this membership association as of the time that it was formed As of the time that the case was filed in November, I believe, of 2014 The members had no right to vote and did not pay dues And as Judge Lynch's opinion for the First Circuit explains That's never been a requirement for a membership association A true association of individuals and other groups that come together to advocate collectively Where some of this court's cases have gotten into the question of the ability to vote or dues Have been when organizations that are not membership associations have come before the court And said that they should be treated like membership associations And then this court had looked at indicia of membership But it's never done that with an organization like the Avalance Group, which has individual members And again, that's in a sworn declaration You don't think that the Sorensen case is similar to this case? I don't, Your Honor, because in the Sorensen case The association, in addition to being funded entirely by the other petitioner This court concluded that it couldn't verify that there was a single member of the association That would have individual standing The only person who had been identified as a member Was the one individual who was the director of the association And this court had serious questions based on the showing in the opening brief About whether that individual would even have standing in her own right That's not the case here with Dr. Bedilli, or for that matter with Dr. Galozzi Dr. Bedilli's individual standing, as I noted, isn't something that the commission disputes at all Of course, we think that Viasat has standing as well But the simplest way for this court to reach the merits Is to hold that Dr. Bedilli has individual standing He's a member of the Avalance Group, and therefore the Avalance Group has associational standing Unless the court has further questions on standing, I think those are the key points I want to emphasize And I would like to turn to the merits, and I'd like to begin, if I can, with Illumina Can I just ask, remind me, that doctor is an astronomer? Dr. Bedilli is an astronomer and a physicist, that's right So let's assume, if we agree with you, that he has standing And therefore the organization has standing It would make sense that the organization can argue about what you call light pollution  But why would they get to argue about orbital debris, say, which is the harm to Viasat? This is something that this court has decided in a number of cases And the short one-sentence version is, because the agency action approving the satellite launches and deployments Is causing an injury, and if the agency went through the NEPA process There's a substantial possibility that it would change its mind The Wild Earth Guardians case from 2013 Sorry, what's your best case for that? There's a lot of cases that begins with Wild Earth Guardians in 2013 And I believe it's page 713 of that decision Then there are a pair of cases, both called Sierra Club versus FERC, decided in 2016 Both decided the same day, I'm referring to the one specifically authored by Judge Millett In which there is a further discussion of why it is that in a NEPA case You're allowed, say, for example, if your injury is caused by air pollution You are also allowed to argue that the EIS or NEPA documents were deficient for failure to do other things like climate change I mean, I understand why you might think of it that way The agency action is not doing the EIS And if that causes abandonment of the project, the injury is redressed But on the other hand, it does feel a little bit like standing being dispensed in gross To the extent, you know, the astronomers are arguing about the space junk And the satellite person is arguing about the light pollution I don't think it's like the standing dispensed in gross cases, you know, like Lewis versus Casey Where there were a whole bunch of different forms of injunctive relief being sought And only one of them remedying the plaintiff's injury And the reason for that is that the deficiency is the failure to require environmental review Before proceeding with the approval of the Third Amendment And all of the deficiencies, all of the reasons why environmental review was required are all fair game Because they all lead to the same point And EIA should have been required And the agency should have made a proper NEPA determination before allowing SpaceX to launch the satellites that are causing the injury And halting the approval while that environmental review is conducted will redress the injury In addition to the cases I've cited, I would just point to the American Rivers case, which we cited in our brief Which likewise goes through the standing analysis in a NEPA case And says that basically traceability and redressability follow pretty naturally Once you establish that the agency should have carried out the NEPA process And there's a substantial possibility that had it done what it was supposed to do under NEPA It would have come to a different conclusion Because that means that had it done it right, done the NEPA process right, you wouldn't have been injured You wouldn't be being injured today And just one more variation on this theme I take it you would give the same answer If I were to think that the injury with regard to Illumina or the launch emissions Suppose I think that Lujan has some geographic nexus requirement for standing And you don't satisfy that You wouldn't satisfy that for standing purposes You would say the same thing that, well, that's fine You've shown standing by other means And once you do that, you could argue about any pollution impact completely divorced from the plaintiff's individual circumstance Well, I think you could argue about any environmental consideration that should have been considered In deciding whether to require environmental review before granting this order I don't think you could go beyond that But I do agree that I mean, you're arguing about launch emissions And let's assume that none of these scientists are within 500 miles of the launch The answer to your question is yes That once standing is established to challenge the failure to require an EA Then all of the reasons why an EA is required Even if some of those might be reasons that the declarants don't have individual standing to litigate by themselves In an action that implicated only those considerations That doesn't matter because it's all of a piece here And the injury is the order and that the redress is to set aside the order OK, I got it. Thanks So unless there are further questions on standing, I would like to turn to Illumina And I see that my I'm over my time So with the court's permission, you can ask me Thank you, Your Honor. I appreciate that So Illumina, the FCC decided in a very cursory fashion Page 59 of the appendix, really just one operative sentence on the environmental consequences of burning up Illumina in the environment In the atmosphere What it did not sufficiently grapple with is the fact that the consequences of a pollutant like Illumina can be can far outstrip whatever quantity is Is actually put into the atmosphere The evidence that's in the record demonstrates that. So, for example, just one molecule of a radical like HOX or CLOX can destroy hundred thousand molecules of ozone So the knock on effects of this type of pollution are enormous That's why I really would just point to pages 469 and 478 of the appendix as the best discussions of why the presence of Illumina in substantial quantities in the stratosphere poses a real risk to the ozone layer The FCC did dealt with none of that. In one conclusory sentence on on page 59 I said that it thought Viasat had demonstrated that there may be a substantial environmental impact As this court said in the American Bird Conservancy case, the May standard is not a very high one Because after all what you're looking at, you're not even conducting the environmental review yet You're looking only at whether over the course, over the lifetime of the federal action, which here is 15 years The combustion of 10,000 satellites, each of them containing 230 pounds of Illumina in the atmosphere may have a substantial environmental impact I understand that there is a dispute about what the exact quantity of aluminum or Illumina would be And I understand that the scientists have had a vigorous debate about what the impact on ozone would be You said 230 pounds. Do you mean 230 kilograms? Or maybe I misheard you Let's see. I have 230 pounds. I'm sure Mr. I may be misunderstanding, but I'm sorry. Go ahead So that results in an unprecedented quantity being deposited directly into the stratosphere And our submission is that that at least required some form of environmental review at the lowest level, which is the preparation of an environmental assessment Before the commission could say, consistent with the APA, that there would be no significant environmental impact Mr. J, I know that the commission kind of punted on the question of whether NEPA's scope even covers some of these alleged environmental harms But in some ways, it does seem like it's the most law-based reason to deny your petition on the merits I can see NEPA, which refers to the human environment, covering the launch, covering falling debris that comes to Earth, covering Illumina, maybe covering light pollution But the idea that orbital debris that is in space and stays in space is part of the human environment seems to me a tough sell And so I wonder if you could give me anything that you think could happen in space that would not be covered by NEPA So let me point you first to the CEQ's current regulation on this subject, which is 40 CFR 1508.1 Q1 Romanet 1 So, and this is a relatively recent addition to the NEPA rules. It is something that I understand CEQ is taking another look at, which I'll just Can you repeat it? Can you repeat it one more time, please? Of course, I'm sorry. It's 40 CFR 1508.1, which is the definitions provision of the NEPA regs, Q1 Romanet 1 And what that provision says is that under the CEQ's current view, NEPA does not reach matters with effects located entirely outside the jurisdiction of the United States So as your question recognized, there are many things that we've raised in our petition that absolutely have effects in what is indisputably the human environment The stratosphere, the ground, the type of aesthetic effects that light pollution raises, which are squarely within NEPA So I do think that there would be a question for the agency about if a petition raising orbital debris alone were a sufficient basis for environmental review The agency hasn't reached that question. This, I understand, is an issue in which the administration was sued when it changed these NEPA regulations Which we think is all the more reason why this court should not get out ahead of the agency and try to decide the scope of NEPA As your question recognized, the agency expressly declined to decide that any of the things that we raised were outside the scope of NEPA True, but it is a question about the scope of the statute And we do have a strong canon of construction that federal statutes don't apply extraterritorially And if they don't apply, presumptively don't apply to Canada, presumptively they also don't apply on the moon or nearby orbit No, I understand the analogy, Judge Katsas, but I think this court considered that in its decision in Environmental Defense Fund in, I believe, 1994 On the question whether NEPA would apply to a federal action that was to take place exclusively in Antarctica And it concluded that because Yes, based on, I think it was the Ninth Circuit FPCA opinion that was unanimously reversed by the Supreme Court No, I don't think that's fair, Judge Katsas, and if you look at Part 2A of that opinion, I believe You'll see that this court does cite the Ninth Circuit decision and note the CERC grant in that case But it also, it's making a decision based on how NEPA operates What does NEPA do? NEPA does not regulate action, it regulates government decision-making And the reasoning of that case was that the government decision-making would take place in Washington, D.C. and not in Antarctica Which seems very hard to reconcile with You can take either the touch and concern analysis in cases like Keeble or you can take the headquarters analysis in SOSA I mean, you're running up against a lot of extraterritoriality law there Respectfully, Judge Katsas, I think that in decisions like RJR Nabisco and similar cases There's the two-part question, whether the statute has an extraterritorial effect We're not claiming that there's a plain statement in NEPA We would look at, this obviously is, all the more reason for the agency to You're saying the focus of NEPA is the government decision-making, which is here on Earth I'm saying that that is the question that would have to be decided in order to answer this question I think that is something of which the administration more broadly and not just the Federal Communications Commission may well have views I understand that it's in the process of reconsidering many aspects of the 2020 NEPA rulemaking And all the more reason for this court, as the Supreme Court said in Negusi, not to get out ahead of the agency and the executive branch on a subject like this But ultimately All my favorite cases They seem the right ones to cite here, Your Honor Even if NEPA reaches Antarctica, that seems closer to the phrase human environment than Mars does So did I hear you to concede that orbital debris is not within NEPA's scope? I doubt you did that So can you give me an example of something that happens in space that is not within NEPA's scope? Or is your position that NEPA covers the universe? No, no, it's not that NEPA covers the universe And I am absolutely certain that there are any number of effects that take place Whose effects are sufficiently beyond the surly bounds of Earth that NEPA would not apply to them But just to take the orbital debris in this case, remember that the light pollution Wait, Mr. J, I know you said you can think of examples It would be helpful to have one I just want to make sure I'm clear on the question, Judge Walker You're asking for an example of something that NEPA would not cover? Yes I mean, so bracketing for a moment The NEPA regulates agency decision making and not the consequences of that decision making Which is the subject of my exchange with Judge Cassis I think that something beyond Earth orbit that has no effect on Earth I mean, I could easily see a mission to Mars not being subject to NEPA To the extent that it takes place entirely outside of Earth And obviously there are launches, there are effects in the atmosphere as the rocket goes up What if it affected the astronomer's view through a telescope of Mars? Would it then be within NEPA's coverage? Possibly, but let me distinguish that case from this one in a way that I hope will be helpful Because in this case, the light pollution argument is very closely tied to what is in low Earth orbit And our orbital debris argument is not distinct from it But it is related to the light pollution argument Because the cumulative effect of sky glow on Earth with biological effects on Earth Is determined in part by all of the objects in low Earth orbit Which would include the debris that's generated when there's a collision So I think that the nexus between our light pollution argument and the effects on the human environment But the light pollution argument I think you've argued is distinct from the astronomer's complaint That when they look through their telescope, their view of certain bodies in space Are going to be obscured in some way Maybe I'm misunderstanding No, their study is being interfered with, that's certainly true One reason though that that has a direct effect on the human environment  Especially at twilight, when it's important for the sky to be as dark for their study as possible Is threats to the Earth from incoming objects like asteroids and so forth I think you can see the direct connection between that and the human environment I'm not saying definitively that the Hubble Space Telescope's observation of another galaxy Could not possibly be within NEPA's scope, even though it is definitely interfered with By SpaceX's satellites But I do think that that's farther afield, literally All of which to say that you don't need to answer this question Not only because the agency has decided it But because some substance of our argument is that there are effects on the human environment Right here on Earth's surface, or in the stratosphere, or in the ozone layer All tightly within the scope of NEPA And the aesthetic effects of light pollution in particular Even if the scientists were just offended by being photobombed by satellites As opposed to being unable to do their scientific work The aesthetic effects are well within the scope of NEPA Expressly recognized in I think subsection E1 of the effects regulation That the CEQ has Given the time, why don't you just very briefly just touch on the merits Other than what we've already discussed about the scope of the study I have trouble hearing the question, the merits of The merits of your NEPA argument Why don't you just take a couple minutes to highlight the merits of your NEPA argument I appreciate that, your honor I think you have my argument on Illumina for the most part Light pollution, just three quick points One, the discussion about mitigation is kind of a red herring Because the question is not whether the NEPA analysis can consider mitigation The question is whether the harms have been mitigated And they have not. So the second point is on the actual satellites themselves Which have not been dimmed to a level where they would not be visible with the naked eye We have put in extensive evidence on that subject And then third is that even if individual satellites might be dimmed Over the course of the 15-year license term so that they couldn't be seen with the naked eye But only with binoculars or only with scientific instruments Even then, what the agency hasn't addressed is the cumulative effect of all of those satellites In orbit on SkyGlo, and SkyGlo itself is a distinct harm It has biological effects, it has effects on scientific research, including, as I mentioned to Judge Walker Scientists' ability to spot threats to the planet, which are observations that are done at twilight Those are the key points on light pollution And I don't want to tax the court's patience, but on orbital debris I think you have our submission in the papers And I really would just underscore that this is not just speculative That the commission and the evidence that we put in the record Have identified a really significant failure risk And that the impacts of a collision would be quite catastrophic Can you just give me one or two sentences on why that risk is imminent? Sure, so the Give me one second on the page number Right, so page 894 of the appendix Cites a study that estimates a 45.8% chance of a catastrophic collision within five years 35% probability of catastrophic fragmentation over the same term I mean, I think in cases that deal with sort of hypotheticals These are much higher percentages than I think the court is used to seeing in cases speculating about harm And I would just underscore that what the FCC has said is Well, we will tell SpaceX to tell us that if they have three satellites in the course of a year That don't successfully deorbit, we want to know about it We submit that at that point it will be too late If there's a failure problem, the satellites will already have launched And this is precisely why environmental review under NEPA Is generally supposed to be done before the agency leaves, not after But the action under review here is primarily Lowering the altitude of the satellites, right? The 4,000 satellites are already up there No, that's not correct How many? I thought there was just a small number of additional satellites Which would make the marginal risk attributable to this order low So two things about that I mean, first, the FCC agreed with us and not with SpaceX on the question of what is the baseline But the baseline is without, because without this order They did not have authorization to operate any of these satellites in low Earth orbit They said that the baseline is no satellites But they're already up there And that's my second point, Your Honor It's actually, that's not quite right That some satellites were authorized to operate at a higher altitude But a majority were not I mean, if you look at paragraph four of the commission's order I think you will see a catalog of exactly how many satellites were previously authorized at a different altitude And how many were added by this order at the altitudes from 530 On up through different levels of low Earth orbit I'm sorry, is there a differential risk on this point? Does it matter whether they are at the, I forgot the numbers The 1200 kilometers versus the 600 kilometers for purposes of this concern Just for orbital debris I mean, I think the answer is that at the lower altitude, the orbital shell is more crowded So that if you take the number of satellites at the given And you compress them into an orbit, you know, with a It's not a perfect circle, but, you know, with a smaller radius Then the shell gets more crowded I think that's really our point And the reason why you should look at this order And at the total number authorized by this order Is that just the addition of more satellites and the crowding of the orbital shell Is what creates this risk of a catastrophic impact Of course, that impact can be felt well beyond low Earth orbit But as the Bolle and Byers article that we cite says It could make low Earth orbit, a catastrophic collision could make low Earth orbit Unusable by anyone Both the magnitude of the harm and the probabilities to support environmental review I'm sorry, Your Honor All right, thank you, Judge Walker. Did you have any other questions? Judge Katsas? All set All right, we'll give you some time on rebuttal Let's hear from counsel for conditioning Good morning. May it please the court Pantelis Michalopoulos for this This is not the usual case where the agency tells the court I may have been terse in my explanation, but I was not silent Silent. Here the agency was silent and admitted It refused to consider This is expert evidence The study is showing that the SpaceX operation Will exceed the applicable power limits And will degrade or jam the satellite television service Offered today to some 23 million U.S. households Instead, the FCC says I was duty-bound by one of my rules To ignore that evidence But that's wrong several times over, Your Honor First of all, the rule on its face Does not purport to prohibit the agency From considering additional evidence Second, even if it did There's no exception to reasonable decision-making For an agency following rules That purportedly contain such prohibitions And then the FCC waived the very rule That it says it is bound by This is the requirement of obtaining an ITU Finding of no interference prior to initiation of service Well, a rule cannot be sacrosanct And disposable at the same time And then the waiver itself was not permissible The agency said, we see no reason To revoke the previously granted waiver Well, no reason not to Is not reason enough under the APA And then the FCC said We can ignore this evidence Because we put our trust In the licensing process of the ITU Of course, this makes no sense Because the ITU process was waived For several years But it also makes no sense Because the ITU itself, the foreign agency Has said we are not to be trusted Always The ITU said Sometimes our software Cannot adequately model Those non-geostationary systems And in those cases we expect you The licensing administration Meaning the FCC To indicate to us a problem exists And then to give us your own commitment That there will not be interference What does the FCC say to that? It's buried in a footnote In note 16 of its brief And in jargon But what it says is Well, we didn't indicate to the ITU That the problem exists But of course that's not the issue The issue is not whether An indication of a problem has been made But rather whether the problem exists And the agency could not know Because it had not considered the evidence And then the FCC places all of its trust Until a finding by the ITU is made Several years on In the regulated entity itself And the brief is candid about that The FCC says We rejected this claim of harmful interference Why? On the basis, verbatim Of SpaceX's certification That its operations will not cause Such interference Period Nothing more Its certification without I have a question about all of that What does it mean What does it mean when the agency says Okay, we're waiving The ITU approval Before you commence operations But you are proceeding at your own risk What does that mean? Yes So what the agency said It means, your honor Is that SpaceX will have the incentive To do the right thing Because of the purported Damocles sword Of the ITU making a finding down the road That's just not true In fact SpaceX will have the incentive To do the wrong thing During all those years Before the ITU finding It will have all the incentive To operate at high power To reap the benefits For its service Of those high power operations And then When the finding comes And assuming that the finding is That yes, there is interference All it has to do is Dial down the power No harm, no foul for SpaceX Harm and foul For the 23 million satellite Electricity I'm understanding something Let's suppose that They do proceed in that fashion SpaceX does And they operate at high power And You know Dish subscribers are Interfered with You know And you know Their service goes out During the Superbowl Or something Won't there be consequences For SpaceX If that were to happen Even if the ITU is not Active yet It's very doubtful, your honor Unfortunately First of all Any complaint we may make To the FCC That our actual Subscribers Have been Interfered with They cannot watch Their favorite programming Will be after the fact So the harm Will have been done Secondly The Agency's Logic here Both in its brief And in its order Suggests That the empirical Percipient evidence We will then offer Will suffer the same Fate As the expert evidence We have already offered So there's no guarantee That the FCC will not say Look Our rule prescribes What is enough We're not going to look At that evidence So let me This is a very important point to me I want to make sure I understand Correctly So Are you saying That if you believe That there has been actual Interference That was caused by SpaceX And you have expert You know, testimony That an evidence That would prove That SpaceX Caused actual interference That When the agency says Proceed at your own risk It means that the agency Still wouldn't even consider Your evidence It would only consider What the ITU concludes? Yes, your honor That's exactly the concern And not only that's the concern It's what has happened Because we have already As I will get to Offered that expert evidence Undisputed evidence On how it interferes And so the only case that The FCC decides for this The sufficiency of the certification Of the regulated entity making The regulated entity judge And jury of its own case Is global crossing But there This was a sufficient initial step Not the final And conclusive step For enforcing any FCC Rule And so this is I hope you can see the globe This is the system Owned and operated by this A few satellites Stationary located at high altitudes Above the equator They provide direct to home Satellite television To millions of households Throughout the US And here I apologize for my  Throw this away This is an illustration Of the SpaceX system Many thousands of satellites Swarming at lower altitudes Moving all the time They are under an obligation To not cause harmful Interference into satellite television And to that end The ITU has developed Power limits And the FCC has adopted Those limits. That happened back in 2000 And I want to clarify something Because the FCC Without due respect to Jim Has muddied the waters Here. We have no Quarrel with the standards Themselves. The ITU Developed them. The FCC looked at them Decided they made sense We rely on those Limits for our own protection It is with the failure Of the FCC to Apply those limits below That we take exception And so this is part of our Evidence And what it shows is that if you use The ITU software But do not take Into account Do not set the actual location Of the satellite television Dishes, you ended up with one of those Locations being Off the shore of Greenland And this matters Because the calculation of power For purposes of the power Limits depends On where the victim station Is located. So here is what Our expert engineer did He used The ITU software. The FCC Is wrong That we did not And that is established at JA-177 But he used a function Within the software that allows You to set the real world Locations of the satellite Television users. And once we did that We concluded that There was Excess over the power Limits throughout The United States. But The FCC says My hands were tied By the rule. The problem is that this is not what the Rule says. The rule says It requires a certification By the regulated entity And a finding by The ITU prior to the Initiation of service. There's nothing that says And the FCC shall not consider Any additional Evidence. Now the FCC Will seize on a snippet From the rulemaking That promulgated the rule. To the effect We don't want to duplicate The ITU's work. But the discussion There was about getting rid Of the prior demonstration Required of the applicant. It was not a discussion About receiving or not receiving Evidence from people Concerned about Interference. And let's not Duplicate. Does not mean let's Not check. When I ask a junior Lawyer to write a brief I do not prohibit Myself from revising it. But let's suppose that the Rule was intended To tie the FCC's Hands. You, Judge Wilkins You wrote in The Environmental Health Trust That when confronted with Evidence that Its current regulations Are not adequate to Solve a Problem, the agency must Offer more than conclusory Statements in order to justify Retaining those Existing rules. And there's similarly No doubt under the precedent That rules may be challenged Long after They leave the harbor Of the rulemaking that enacted Them as they applied In further commission action. So When SpaceX says That we're attempting a collateral Attack on the 2017 rule There was nothing There was no reason to challenge the rule Because there was nothing wrong With it on its face. But there's Much wrong with how The rule was applied Below. Can I Ask a question just to make sure I Understand how The FCC would Resolve an allegation of Inference. So If You Have Evidence That Dish Subscribers Are having Problems and it appears  Inference What you're Saying is that the FCC Has not The FCC Really will not Deem that to be significant But the only thing that the FCC Deems significant Is if Based on The ITU's Engineers Testing They conclude That everything is within the Tower limits, right? This is the Inescapable consequence Of what they have argued both in the Order and in the brief. And of course, your honor, as you know, they haven't studied Commercial servers on my scale yet So there's no empirical evidence yet Of interference. What there is We supplied. And this is Expert, undisputed Evidence that if you do the Actual... But once the ITU Does their Study It concludes that there Will be Interference that they've Exceeded the power limits Then SpaceX Will have to stop operating Right? Either stop operating or dial down Its power, the most likely outcome But meanwhile, this will be Years after While SpaceX Has been providing commercial Servers for years without any Protection for the 23 Million U.S. That's why I asked you what Proceed at your own risk means So let's suppose that In two years ITU finds That they are operating In excess Of the power Limits that are prescribed Would they have to pay Some sort of penalty for having Operated for two years Outside of those limits? Not that the record Reflects. All that Your own risk means Is the risk that if the ITU Were to come up with a Finding that there is interference They would have to dial down the power They would not be able to continue operating At the Shanghai Park. But that's no harm, no foul For them. They've already reached the benefit That's all that risk Proceeding at your own risk Means. And of course Your client wouldn't have any sort of Claim for damages against them? No And by the way, this is not a common Carrier service Where a complaint and possible Damages would be appropriate This is a non-common carrier service And so the record reflects No such opportunity And then the FCC goes and waives The rule. The requirement Of obtaining the ITU Prior to the initiation Of service. Here's what The agency had said Back in 2000 In its own words It is imperative That compliance with the power limits Be verified During the licensing Process. Now it has Thrown this imperative Out the window And it doesn't explain why It says we see No reason Why we should revolt The previously granted waiver That's all it says. It stops there The problem is that AT&T In the comments And reply comments below Had offered the agency Such a reason. It had said The rationale That's AT&T speaking The rationale for your For the Bureau's 2019 Waiver is not Valid anymore. That rationale And if you go to paragraph 28 Of the 2019 First modification You will see that Was to expedite the start Of operations of SpaceX And AT&T said This goal has been achieved The operations have started What Does the FCC say to that? Nothing This is The kind of intolerable Mutinous that just Leventhal has spoken about And it will soon Likely wreak a devastating Effect on satellite Television as SpaceX Commences Its commercial service on a mass Scale unless this court Vacates the order To the very limited extent Of the 12 GHz band Which is a minuscule portion 3% of the total Spectrum, the thousands of Megahertz available to SpaceX Mr. Mikalopoulos, why Do you think AT&T is not Here with you? That's a very good question, Your Honor The Easily Straightforward answer is that AT&T, which means of course DirecTV, the other Satellite carrier, has much Less need Of the 12 GHz band than we do The reason for that is most of its Satellites are in the KEA band So it has some interest, enough Interest to participate in the Proceeding below, but almost All of its service now is in the KEA band, the different part of the Spectrum Thanks, Mikalopoulos All right, Judge Katsas Judge Walters, any other Questions? No Thank you Thank you Thank you All right, I believe Now we're going to hear Mr. Carr On behalf of the Commission Yes, good morning, Your Honor May it please the Court, my name is James Carr And I represent The Federal Communications Commission I'll be addressing the issues Raised by Dish Network And my colleague, Rachel Proctor-May Will be addressing the issues Raised by Biosat and the Balance Group I'd like to Start by addressing the point That Judge Wilkins was making In his colloquy with Mr. Mikalopoulos About Actual interference and Whether if actual interference Were to be measured The Commission would have A different response I think it's important to understand That when the Commission Conducted this Application proceeding, anytime it's Judging an application The It's measuring the Potential for interference There are no actual operations In place, and so It is, by definition, making Some sort of a predictive judgment The ITU Software is designed this way To make a predictive judgment About whether a Proposed Satellite system will Cause harmful interference, that is Whether it will exceed the ITU's power Limits That's one thing It's quite another matter Once a system Begins operating, if there is Actual documented evidence that It is in excess of the ITU's Power limits, then under the FCC's Rules That system is required to come into Compliance with those limits Otherwise it will be causing harmful Interference and it will be in violation of The rules, and the Commission would take enforcement Action As Mr. Mikalopoulos acknowledges There is no empirical Evidence at this point that there is Any actual harmful interference And it is the Experience with the use of the ITU software that No actual harmful interference Will occur, but if it does, the Commission stands ready to take enforcement Action Thus far, the ITU software Which was developed over many Years after consultation With a number of engineers and Experts and represents an international Consensus, it's been Effective for five years, it's the best Available predictor of whether Or not a system will comply with The ITU's limits. During Those five years, more than 100 Satellite systems have been Reviewed by the ITU And the Commission is not aware of any Instance in which The ITU issued a favorable finding Based on the software That showed a system was in Compliance, and it was later Determined that a system Was not in compliance, that it Exceeded the ITU's power limits So the ITU's Software has been effective Predictor of Compliance or Noncompliance with The ITU's power limits Now If I could turn to To what extent is The SpaceX Constellation Just different In kind from anything We've seen before Just to me Just sounds fantastic 4,000 satellites up there Is that something Well Beyond what you've dealt with Before It Is It's a significant deployment It's not entirely Unique in the sense that I know There's some discussion in the reply brief About steerable beams There are other systems with steerable Beams In terms of the size of the deployment I'm sorry, your honor, go ahead So how comfortable are you extrapolating To something that seems A good bit Larger, more complicated Potentially more troublesome No, the ITU's software was designed To deal with All sorts of satellite Constellations, including ones This large. There is There are some Non-geostationary Satellite operators That have argued That The software should be Revised because it actually Overstates the potential for interference By these more complex Systems So there is a process By which the ITU Considers whether to revise Its software, and that's discussed In the Circular that was cited in the That is in the joint appendix At 249 to 251 of the joint appendix is a circular By the ITU, and there's a Discussion of the Working party 4A, that's a group In the ITU that considers Revisions To the software That's done after holding Various international meetings. There is a U.S. delegation to the ITU That considers Whether to make recommendations about Making changes to the software It's a complex Process, and it took years To develop the current software Because these are very Difficult technical issues But there is A process, and if Dish believes that the current software Is not working the way it was Intended to, it can actually Go through the process, go to the U.S. delegation of the ITU Explain its concerns Present a technical paper, and If those Parties agree, they can get the ITU To revise its software But at this point The commission, and the commission When it adopted its rules In 2017, made Clear that it was going to rely on certification By applicants That they were in compliance With the ITU's rules, and that Certification was going to be based On the ITU's software. The commission Said it was going to require Applicants to use the software to verify Compliance And basically What Dish Asked the commission to do here Was to go outside of its Rules and its normal procedures To second Guess the certification and to take a look At A different analysis that was not based On the ITU's software and Methodology And Basically second guess SpaceX's certification So you don't Concede that what Dish Did was essentially The same analysis That the ITU will do When they eventually get around to it No, I don't concede that at all Your honor, and I think the SpaceX self Acknowledges if you go to The joint appendix Page 176 In its second interference study It acknowledges it's doing Something different from what the radio Communication Bureau of the ITU Would do Unlike the previous study This is in the first paragraph The previous study being the first interference Study We do not rely On the recommendation of the ITU To use the worst case Geometry algorithm That the ITU radio communication Bureau does. Let me explain what the worst Case geometry algorithm is And this explains why If you have a measurement of Power In Greenland The worst case Geometry algorithm Is applied, it's a methodology That's applied with the software It identifies those Areas where the proposed Satellite system is expected To have the highest level Of power emissions So in this case, one of those Areas was Greenland And the Theory behind the software is If you identify the highest Levels, the areas where The system is projected To have the highest levels of emissions And if those levels Remain within The ITU's limits Then you have a compliant System That's basically the way the ITU Software operates What DISH's consultant did was It force fed And manipulated Its own data It pointed to particular Locations and the software isn't Designed to model Or measure The power emissions in Those particular locations So it did not use the same Procedure that the ITU Would use And that's why And the commission said it's Not going to consider something that doesn't Use the ITU Approved software and methodology Let's suppose the ITU Completes their work And they Say that Everything will be in compliance With all of the relevant Levels and Requirements Can DISH Seek To use its scientists To replicate That And if they Were to find that ITU scientists were just wrong They made a mistake Could they bring That to the commission's attention Or is what the ITU The ITU's conclusions Essentially kind of non-reviewable Well I Think it would be hard for DISH to make that kind of argument It's important to understand That The software that SpaceX Used to certify Its compliance Is the same software that the ITU Will use to assess compliance If there Is a problem later on it might be Something to do with the input Data but in all likelihood The The software is going to When the ITU applies the software It's going to reach the same outcome And I would remind the court As we pointed out in our brief DISH itself When it used the ITU software As intended in its First interference study found That if SpaceX Operates its system as it Has proposed to do Limiting its service to no more Than a single satellite beam In an area at a time The software shows that SpaceX Is in compliance with the limits So DISH Can't really dispute that I think that's why you have the later Studies where DISH decided it was Going to have to come up with An alternative methodology to show Interference because the software If properly Applied shows That SpaceX's system Will not cause interference That it is in compliance with the limits I don't think One other question is What does the commission mean when it says We're granting this Waiver but you're proceeding at Your own risk. What does that mean? Well your honor I think what the commission had in mind was That if And I believe it said this In the order. If The ITU Were to make an unfavorable finding With respect to SpaceX's Operation then SpaceX would Have to alter its Operation to come into compliance With the ITU's limits And I think Another thing to keep in mind Again we don't expect This is going to happen but even If during the time That this matter is pending at the ITU If it emerges that there is Evidence of actual interference Then SpaceX would be Required under FCC rules To come into compliance with The ITU's limits And to reduce its power emissions To alter its operations How would an entity like DISH Establish that there Was actual interference Well my understanding is That there are measurement devices That can be used Once you have A system in operation You've moved out of the room The realm of the hypothetical The theoretical, the software models And you can actually measure The power that is Being emitted from Satellites That's my understanding That there are measurement tools for doing that That sort of thing So they could actually measure The power That's being Directed at a particular Facility At a particular facility In a particular area That is my understanding And at that point if there is Documented evidence that SpaceX is out of compliance It will have an obligation to Come into compliance There's also And And are there penalties Financial penalties Or is it just a Wag of the finger and you're told You have to come into compliance Well there could be There could be penalties It would depend I suppose on the Severity of the interference And it could also be If it were found That Let's say SpaceX Made a bad faith certification That it was not Going to interfere If there were evidence That SpaceX knew that it were That its operations Would interfere That there could be Fines or forfeitures under Sections 501 through 504 Of the Communications Act The commission Would even be authorized And I'm not saying this I'm speaking strictly hypothetically There's no evidence that SpaceX Has done anything wrong But if there were Evidence that SpaceX had Knowingly misrepresented That It could certify compliance That it knew that it wasn't In compliance and it certified anyway Under 312A1 Of the Communications Act The commission would have the authority To go so far as to revoke SpaceX's License based on a Knowingly misrepresentation So there is the potential for some serious penalties I would point out also I'm sorry I would point out also At JA68 One of the conditions Of SpaceX's Operation It's paragraph 97 Subparagraph T It talks about how during Certain periods of its operations SpaceX must operate on a Non-harmful interference basis That is SpaceX must not Cause harmful interference That's consistent more generally With the commission's rules Particularly 47 CFR Section 25.289 Which says Non-geostationary systems Must not cause unacceptable Interference to geostationary Systems and if there is evidence that they are Doing so They'll have to take action To remedy I took This year's answer to one of Judge Wilkins' questions To be that In these kind of worst case Scenarios you're describing Dish Or its customers would not be Able to sue SpaceX for damages Do you agree with that? I don't honestly know, Your Honor I don't That could be a separate That might be a separate question There might be separate civil litigation That doesn't involve the FCC That's not what the FCC Had in mind when it said That SpaceX would proceed at its own risk Well I think It might have been a consideration I think what the FCC had in mind Was regulatory Consequences from the FCC That If it went ahead and Deployed All these satellites and then it turned Out that there was some That it was causing interference It might have to Reduce the number of satellites Move the satellites around It could be disrupted to their operation To have to deal with these sorts of Compliance issues later on down the line I think that's all the commission had in mind As far as It seems like The fundamental obligation Imposed by the Statute and the regulation Is to Prevent Harmful interference Nothing should be permitted Unless It can be done Without Without there being Harmful interference So it seems Odd That very core Requirement that fundamental Requirement that everything else Is really dependent upon Is Waived and we say go ahead And kind of Like you know ready fire Aim We're going to let you go ahead And operate and then Demonstrate Pursuant to The way that we require these things To be demonstrated That there's no harmful Interference Why is that a reasonable way for an agency To do something like this Your honor I would disagree with the premise That the commission just made absolutely No findings with respect to harmful Interference Under the rule that was set up Applicants have to certify That They will not cause harmful interference That they are in compliance with the ITU's limits and that certification is Based on the ITU's validation software Which is the best available Predictive measure that we have Compliance for Applicants who are proposing satellite The commission based its analysis Granted the License based on that Certification and And that was a perfectly reasonable And permissible way to proceed If the concern is that I guess Your Question goes more to the I guess the waiver issue With respect to The commission allowed The service to commence Before the ITU Made its Validation finding made its favorable Finding and the commission Explained why it did that In this particular case there Was a public interest A compelling Public interest in Promoting expedited Deployment of this Service And it's not just limited To the first Modification Although AT&T Said well there was there was no reason To extend This waiver to the third Modification but the commission Found in particular that this third Modification would have Particular public interest Benefits for polar Regions for communities in Alaska Who have been traditionally unserved Or underserved and This particular modification would Make broadband Service available to those communities In some instances for the first time Communities that Where service has been unreliable Unaffordable Sometimes completely So there was a reason For the commission the commission believed That waiver was justified In that circumstance and the commission Took comfort in the idea that Because SpaceX had used the same Software to Certify its compliance that the ITU was later going to use To verify its compliance But the likelihood was That the ITU would Ultimately confirm SpaceX is in compliance Thank you Judge Katsas, Judge Walker Do you have questions? Thank you your honors Thank you We'll now Hear from Ms. Proctor May Good morning Your honors, may it please the court I'm Rachel Proctor May on behalf of the Federal Communications Commission And the United States I'd like to start with the balance Group's associational standing There is no case that Says that a court Has to take their claims to be A traditional membership association or Functional equivalent at face value And that includes the Cases that the balance group has cited Those cases including Students for a fair admissions all Involved traditional membership Associations where it was clear That they were traditional membership associations Based on things like articles and incorporations And bylaws which The balance group has not offered Here and this serves an Important constitutional principle It protects the injury and fact Requirement the associational standing Doctrine allows an Uninjured organization to bring Injured individuals to the Balance group and In order for it to properly Do that it must have An identity of interest With the individuals it purports To represent as discussed in American Legal Foundation So to the extent that People join Join the organization And we have Evidence in the record that that's Kind of how it works That we kind of have to Affirmatively associate Themselves with the balance group Why isn't that so? Well if the affirmative Association is joining The email list the court did Reject that in Sorenson and if it's putting in A declaration the court rejected Declarations From supporters In American Legal Foundation And again it turns on What is the nature of the relationship Between these individuals And the Organization it keeps organizations From just finding People and signing them Up after the fact so that when they Don't have standing on their own They can manufacture it After the fact I think it's Clear here that there's been no Indication that the balance group Was a traditional Membership association again It's It hasn't disputed that you become a member By joining the email List and its own website States that its membership kickoff meeting Was in August 2021 That's at the government's Addendum at 13 so I think There's ample Reason for the court to look past the Bare assertion of actually having Members We've also disputed bias at standing They've asserted two purely Economical entries that are conclusory And speculation that it's Satellite might someday be damaged But if your honors have no Questions about that I'd like to I do I do miss may with regard to Bias that because it seems Like something that might Eliminate the need to inquire Into this the balance groups Standing Advice that says that in Order to continue deploying Its satellites That the deployment Of the space x satellites And the lack of the NEPA economic Environmental assessment will cause Will cost it money that That it will cost more money To and it will be more Complex to deploy their satellites It's not An environmental harm but it Seems like it's an article Three standing harm article Three standing injury and As I understand It the FCC did not Argue that that economic Harm falls outside NEPA's Environmental zone of interest So Tell me why I shouldn't Propose this for Our disposition There's article three standing Yeah we Disputed both article three standing And the zone of interest for the article Three standing our argument is that They haven't substantiated that It will in fact impose additional Costs on them Operators already have to operate In a World and a universe Where there are there's significant Other satellites and so They they have claims that they have To impose Additional cost to take on additional Costs because there will be more Satellites in space But they haven't substantiated that And there are many cases in which this Court has not taken conclusive Claims of financial injury at face Value such as Swanson Manufacturing Group and National Association of Home Builders Why is it not Self-evident that If SpaceX deploys More satellites than have been Deployed in all of human history Combined that it will take Whatever complexity Biosat Already faces and make it More complex in a way That will be more costly Nothing in the Record shows how Biosat addresses That complexity you know perhaps there Are computer algorithms and you press play And the computer dodges Other satellites going up Perhaps every Launch no matter what They have to be on cost The same it's just it's Biosat's Burden to demonstrate Their standing and they haven't said anything Other than it'll be more expensive And we just don't know why And then What is the baseline How many additional Satellites does The order under review Authorize? Sure so I'm just going to start from the beginning just to make it very clear So the Original authorization In 2018 authorized 4,408 satellites And those satellites were authorized To operate at 1,100 to 1,300 They're already in space No no no this is what I'm trying to Explain and there was some confusion about this So this is why I'm going to take a second to walk So they Were at 1,100 to 1,300 They were authorized to operate at 1,100 To 1,300 However they didn't start launching Because at that time The launch was conditioned on An updated orbital debris plan To make sure that SpaceX Was meeting its obligations under the commission Orbital debris rules And so In the first modification proceeding In 2019 that was when SpaceX received full authorization To launch 1,584 satellites and so those Satellites have gone up And in this proceeding It is Receiving the final authorization For the additional Approximately 2,800 satellites Okay Sure I think I was at the Zone of interest For Can we just quickly do Article 3 on the Orbital debris Point I mean intuitively that Sounds Very unlikely To me but Mr. J Cited Very specific allegations about A seemingly not Insubstantial risk over Whatever period of a couple of years Sure So just two things First of all the orbital debris Is not the injury The injury would be the Ultimate damage To a The risk that the debris Will harm a Biosat satellite I'm sorry that was my short answer Okay The article that Mr. J cited At JA894 Is from It's just not accurate It's outdated more to the point It's from 2019 It was discussing The proposed SpaceX Constellation when it was still at 1,100 kilometers Satellites at a lower altitude Have a lower collision risk This is because they can more quickly Be returned To the atmosphere to demise At the end of their useful lives And so when the commission Actually looked at the Current data Based on the actual Observed failure rate of SpaceX Satellites to date It calculated a far lower collision Risk of no more than A total cumulative Collision risk of no more than 1 in 44.5 over the entire 15 year term And so that is the risk that SpaceX might Suffer a collision And then the risk that Biosat would be injured By that collision is smaller Still For that reason as this court Is considering whether Biosat has met its burden To demonstrate that the Increased risk is anything other than speculative We would submit that it has not met that burden You said that The commission found that it was 1 in 44.5 That was the highest It was a range of risks Because the The estimate of collision Risk turns on factors that Are in flux as SpaceX Adjusts its operations Obviously it has an interest in continually Improving its satellites So that they don't collide And so it was a range Of risks. It's discussed at paragraphs 61 to 63 of the order Which is at JA 59 I believe That's a low Percentage But it's a pretty Catastrophic consequence I mean if you told me there was a 1 In 44 chance That the airplane I was about to get on would crash I probably wouldn't get on The plane So why isn't that Well again it's a 1 in 44 Risk at most And again I'm sorry I want to make one more thing clear When the commission was calculating that risk It was used for the entire 4400 satellites So the number for This set of 2800 satellites is lower still So I don't want to get But it's 1 in 44 But we're not In the realm of De minimis Well we haven't Shown that the realm of That for Biosat The realm is not De minimis Because even assuming that SpaceX has a collision It's far From clear that that collision Would ever damage A Biosat satellite I'm sorry what is 1 in 44 chance of what Of a Collision Over the 15 year License term Assuming that Collision Of what to what Yeah that SpaceX Satellites will suffer a collision Full stop So it's not 1 in 44 It's not 1 in 44 for Biosat No absolutely not And Biosat hasn't Offered anything to let us know What it is So we just don't know And so therefore it hasn't met its burden 1 in 44 that a SpaceX Satellite Again I should have used the Larger end of the range It's The smallest range That it's the end of the range Was 1 in 44.5 Cumulative risk That a SpaceX satellite Would suffer a collision Over the 15 year license term Based on certain Assumptions about the Retirement rate and the number of Entire 4400 And that could be A collision with One of the other 4000 SpaceX Satellites Sure Or a Collision with the 1 Or maybe soon to be 2 Satellites that Biosat has In the same orbital range That Is it is conceivable But again I would say that 1 in 44 4000 that are SpaceX and 1 That is Biosat Then maybe that is pushing Back towards de minimis But why isn't A single one of those Collisions if it were to happen With Biosat Necessarily significant And so if we're looking At the language of the regulation Why shouldn't We consider this to be Meet the standard of May have significant impact Sure so we'll Shift to the merits now As to the Collision risk what the Commission determined was That it need not reassess That risk Under NEPA When it had already fully Assessed the risk as part of Its orbital debris analysis So it has a 15 page Paragraph discussion in the order Fully analyzing and estimating The risk based on the factors that we've been Discussing And then when Biosat Argued you need to redo This under the auspices of NEPA The commission reasonably Concluded that there was no point in doing that Obviously NEPA is governed by A rule of reason that Judges the Need to do additional analysis Based on the usefulness of that analysis And Biosat Hasn't explained any way that redoing The analysis would be useful to The commission or what that would Even consist of given the Inherent Uncertainties in calculating collision Risk based on the factors That it's based on And so if I could Turn to some of the Arguments that Mr. Jay made about Illumina He pointed You to JA469 That had some very Scary sounding language regarding Radicals. I just might like To make clear that a radical Illumina is not a radical Illumina is a particle And so that article Discusses both radicals And particles but it's particles That we're concerned about for Illumina And so In that sense it is very much mixing Apples and oranges which is I think what this Record is doing in general Just to be clear The evidence regarding Illumina consisted Of three pieces Of evidence. There were two articles Addressing Rocket emissions which is Not what they're alleging here And those are at JA465 And the one conference poster Discussing Up to 100,000 satellites Which is at JA520 And so when These Evidence sources Address A far greater number of Illumina Sources than is actually at issue With these satellites It was entirely reasonable for the commission To use its judgment To draw the line between significance And not based on inherently Imperfect data which is what Agencies do all the time And here I think it would be helpful to step back And remember where we Are in the NEPA Framework. A categorical Exclusion applies To actions that The commission has already determined Normally do not Have a significant environmental impact In the commission's NEPA implementing rules That's 47 CFR 1.1306A And so 1.1307C The rule at issue here is an exception And it applies when Two things happen First there's a written petition alleging In detail environmental Effects and second The commission makes a Threshold determination Whether there may be significance Or not. The rule is not Some impact. The rule is significant And so here The commission recently concluded that These three articles That spoke to far greater numbers of Illumina sources simply didn't Establish that that may have a significant Impact standard was met Turning to The night sky, mitigation is very Much not a red herring Again the commission made clear That the evidence that Biosat had put forth Addressed large Satellite constellations in general That's at JA 60 paragraph 86 And so it then Described how SpaceX is different SpaceX is different because it's Working with the astronomy community To minimize its impact in the ways Described in the order. It's trying to Darken its satellites, it's using visors It's lowering its altitude And that astronomers Had put in a Letter Explaining That those efforts were paying off And so And so for these reasons it was Entirely reasonable for the commission To conclude that The impact Of The SpaceX satellites at issue did not Meet, they may have a Significant risk standard And I see I'm well over my time Do your honors have other Questions? Isn't that Similar to Kind of competing Meaning The talents have Scientists who Astronomers who disagree So why isn't this a situation Like in our precedent Where You know if you have Kind of competing studies That's Sufficient to trigger These summaries? Sure, this case is very Different from American Bird Conservancy American Bird Conservancy At a starting point held that the commission Can't rely on uncertainty But it didn't hold that The commission must Prepare an environmental assessment Anytime there's a petition asserting Some effects but where The evidence leaves them Unclear or the scope Unclear. That would be inconsistent With the rule and it would Have significant practical implications For example, one could point to These same three articles To suggest that any other Satellite constellation would have To go, or not even satellite constellation, satellite Deployment would have to go through An environmental assessment And so Then if the answer to that would be well Here we've got 3,000 and somewhere else There's 300 and somewhere else there's 30, that's exactly the point I think the commission needs to be able To look at the competing Evidence and draw The line based on Its judgment just as agencies Regularly do Thank you Judge Katz Just quickly, do you agree with Mr. J that if there Is an appellant Withstanding That party can Raise the full range of The appellant Unrelated to that party's standing In the context of A NEPA Environmental assessment That is my understanding, yes Okay, thank you I have one question Judge Wilkins If that's okay We have time for one question Ms. May I don't want to reopen the discussion We had with Mr. J about How far NEPA extends Into space If at all But in answering that question Trying to answer it In the run up to this argument I struggled with imagining how White pollution works And the image I had in mind is that The sun is sending particles of light And they bounce off these satellites And those particles Then enter the earth's atmosphere Making it Harder to see the night sky Because there's more light Particles in the earth's actual atmosphere And that kind of matters to me In terms of if NEPA's scope stops At the earth's atmosphere, it matters to me If these particles are entering the earth's Atmosphere, these light particles Am I imagining white pollution Well enough to understand it For the purposes of this NEPA question I am not an expert And I will give you my understanding My understanding Is that the sun The sun's light Reaches the satellites And then the satellites reflect them to earth Which is why they're visible at different times Of the day And so I would assume that there are Satellites that are Outside the atmosphere Perhaps The atmosphere has various layers And so I think it depends on what The conditions are going to be at different altitudes I would think that some are within the atmosphere And some may be outside of it But again, I am far from the expert And barely even conversant in this topic Thanks. That's helpful All right. Thank you Any other questions? All right. Thank you, counsel Thank you We'll now hear from counsel For intervening May it please the court The big shot for intervener SpaceX If I may start With the NEPA issues, your honor Where Ms. May left off And I think it's helpful to pause for a moment Spend just a moment on the framework Here the court is not assessing De novo whether satellite constellations Collectively pose the risk Of a significant environmental impact Rather the question here Is whether the FCC acted arbitrary And capriciously in finding That NEPA challengers failed to meet their burden To quote Set forth in detail reasons Justifying further review To overcome the unchallenged Categorical exclusion For the specific 2800 Satellites at issue We're not talking about a 42,000 Satellite constellation That the challengers are trying To raise before the commission Or 100,000 satellites With replacements That framework matters Because there are real Costs to requiring an environmental Assessment here and that's the whole Point of NEPA's burden shifting Categorical exclusion framework Not only are there the time and resources Albeit significant That come with preparing an EA But there are particular costs To the public interest here We're talking about severely delaying Broadband access That the commission has labeled A public interest priority To providing broadband access To underserved areas and Unserved areas and that's Not just an impact on ordinary Consumers or SpaceX's business And SpaceX's customers But also Its contracts with the military As we chronicled in our declaration Opposing the stay, SpaceX Through the Starlink constellation And through the modification of these 2800 Satellites at issue is providing Service to the military in the Arctic Regions to detect imminent threats To the homeland. Now all Of these costs That come with the delay associated With the environmental assessment, that's one Side of the ledger. On the other side Of the ledger, your honors, is there is Virtually no environmental Benefit and here Is the reason why. The reality Is that if You force the agencies to conduct Environmental assessments where there is no Need like here, the applicants Will simply seek foreign Licensing to avoid NEPA Claims altogether. This is Not just a hypothetical. Every other non-geostationary Applicant in the Latest round of processing before The FCC with the exception Of SpaceX and Amazon Went to foreign countries To get licensed where they Don't have NEPA. The United States doesn't Have exclusive regulatory Over space So they can get the Deployment license as Biosat Has done. You can get the Deployment license from a foreign country Not have any NEPA obligations Launch, put up those satellites And then simply apply to FCC For market access with The argument that you've now Subverted all the NEPA concerns because The launch, reentry, Illumina, sunlight reflectivity That was all licensed by the foreign Country which doesn't have those constraints And now we're just talking about Interference. And so I think it's important To remember that this framework Has consequences and Applying the framework as it's written Is important here. Now, your honors have Had good questions that we pressed Before the commission that there's significant Questions whether NEPA even applies To this scheme. But I would submit Maybe an even easier way to resolve This case is simply looking To paragraph 78 of the Commission's order. And here This is the key point here Is that much of Biosat's Arguments and evidence Before the agency When they were arguing this Were directed to a collective Constellation hypothetical SpaceX satellites From past, present, and Future. A 42,000 Satellite constellation that Biosat Characterizes over 100,000 Satellites with replacements As the relevant Baseline. This is at JA-437 in their petition JA-937-47 In their reply brief. JA-1268 To 1269 in their SIR reply letters. They write over and over Again, quote, under NEPA the Commission must evaluate the environmental Impact of the 42,000 Satellites and untold Multiples of replacements that SpaceX plans to deploy. They Have completely abandoned that Argument on appeal and that's because in Paragraph 78 the Commission Said no. When you're talking about a Categorical exclusion and a modification Application, you Look at the particular satellites At issue and that is only 2,800 satellites at here. It's not even the 4,400. It's Not the 42,000. It's not The 100,000. And that's Incredibly important Because that's what the NEPA analysis Turns upon. The significant Impact turns upon the magnitude Of the number of satellites. And this is not just Kind of a legal hypothetical Sort of thing. If you look at the very Evidence that Viasat Cites, their primary piece of Evidence on Illumina, which Is their primary argument that They raise, and Mr. J didn't mention It here, but the primary evidence They cited to below before The Commission, it's the primary evidence they Briefed. It's JA520, Which Ms. May Referenced. That is a one-page Poster. That poster Presentation is based Upon the, quote, top 10 Upcoming LEO constellations. And if you add up the number of satellites That that poster was analyzing, It is over 100,000 satellites From 10 different operators over The next, who knows, decades. And then it says the exact Extent, there may be Capable of global warming, the exact Extent is unknown For this over 100,000 Satellite constellation, and so We require more study. It was Certainly within the Commission's Reasonable judgment to take That evidence and say, Look, they have not met their burden Here to show, set forth Specific and detailed reasons To overcome the categorical Exclusion. And Again, the Other evidence is barely, barely Even, it's even more remote. The rocket launches, and as Ms. May pointed Out, in their brief, Biosat says the articles Established that even trace amounts of Illumina could have significant Impacts. That is not what the article Says. At JA469, if You read it, it is talking about Radicals. And as Ms. May said, Illumina is not radicals. NOx is a Surface upon which radicals can React. So when it says Trace amounts at 469, it's Talking about trace amounts of radicals Can knock out lots of ozone. The Illumina is the surface reaction. It doesn't say anything about how much Illumina Is necessary to act as a Catalyst to facilitate those reactions. That's the sort, it can't just be That you can throw in a bunch Of studies that don't speak to The actual harm and say, Ah, for illumina, You get an environmental assessment Because there might be something that could Happen. That is not how NEPA works. And the agency was well within its Discretion to do it. And I would also point The court to JA948 Where Biosat, when they're talking About their own, they have their own, By the way, low earth orbit Application for about 300 Satellites. And they say, well, That doesn't have a significant impact For NEPA purposes because it's Just one-tenth the size of SpaceX Constellation. Well, Your honors, the 2800 Satellites is Less than one-fifteenth The size of the 42,000 Satellites that Biosat Focused on below. And it's less than 3% of the over 100,000 satellites that's focused On their primary evidence at JA520. I'm also happy to Address the other categories. Judge Walker, you In fact, asked about what they call Light pollution. First of all, your honors, That is not what Is normally understood as light Pollution. Light pollution typically Talks about artificial sources of Light that are emitting. Here we're talking About sunlight reflectivity. And again, again, at JA966, when Biosat is talking about The, what they call Light pollution, here's what they say. Quote, the vast fleet Of 42,000 Operating LEO satellites That SpaceX proposes would be Expected to have significant Impacts on astronomy. Well, Again, your honor, the commission rejected The 42,000 baseline, Said it's 2800. Biosat isn't challenging that on appeal. So the question is not whether A vast fleet of 42,000 Might have a significant impact. It's whether 2800 satellites That the commission, based On what it called the robust Record here, found That with the mitigating Steps that it was taking, That by the way, the American Astronomy And Society submitted a letter and Supported, that with those Mitigating steps, we no longer Have a significant impact here. The NEPA regulations specifically Say that agencies can take Account, and it makes sense, Common sense, of course, that you have to look At the action after mitigation. And the agency can make a determination After mitigation, is there A plausible risk of significant impact? The agency sensibly here said No, and there's a lot of technical Stuff about how they darken the Satellites to minimize Sunlight reflectivity, and if you actually Look at the pictures on the internet now, After a few days or so in orbit, They're barely visible To the naked eye. But again, The agency can make the sensible Judgment, as it did, saying it investigated The robust record here, And it put on monitoring obligations, Right? And the NEPA Challengers say that, oh, well, monitoring Obligations show that the agency was Concerned. Well, the agency can't be Penalized for saying, look, on the record That the NEPA challengers have assembled, They haven't yet shown That they haven't met their burden To show with specific reason that there May be a significant impact, but We're going to do belt and suspenders, and We're going to require SpaceX, as A condition of this license, in Virtually every category of harm Here, there are conditions in The license modification grant That requires either SpaceX To report, to keep The agency abreast, to make sure That they haven't veered into A territory where there might be a significant Environmental impact, in which the commission Has retained jurisdiction to Step in at that point. Your honors, I'm happy To talk about the other categories, but Other categories, such as Orbital debris, I mean, to me, that Is the easiest category Here to dismiss, by far, Because the FCC Already has a far more Detailed orbital debris mitigation Regime than would be Done in an environmental assessment. So I have no idea what would be Performed in an environmental assessment That the commission hasn't already done. In fact, There's a longer section of the order, Which nobody is appealing, called Orbital debris mitigation Under the FCC's rules And certainly, I don't think there's any basis that second Guess the expert judgment on the FCC As to whether we have tolerable Risk. The last category I think that I haven't mentioned is the launch Emissions. Again, Launch emissions are primarily The jurisdiction of The FAA. That's how the agencies Have divided up their Jurisdiction here. On page 48 of our brief, We cite the FAA Actually did an environmental assessment Of the very SpaceX rocket that is used To launch these Satellites. And what The FAA found Actually addressing The specific ozone and global Warming effects That Viasat is Now putting into this case Found that they are not Using this material In any way. And that's We cite the FAA EA. If you want to look at that yourself, it's Page 71 of the FAA's Environmental assessment. I don't think there's any reason why this Court would be second guessing Either agency's Expertise on Those topics. Given the time, Do you want To say anything with respect to The issues raised by DISH network? If so, I'll give you a couple minutes to do that. Sure, your honor. I'm happy to Address the DISH issues. I think first and Foremost on the DISH issues, It's important to keep in mind what was DISH's primary argument before the commission. DISH Paid a consultant to come and do a study Using the ITU Approved software and algorithm. The paid consultant did that Study with an NCO Of one, which means that The SpaceX satellites would direct one Beam at a time at a particular Location on Earth because That's how SpaceX said it's going to operate This constellation. The Paid consultant did that study using the ITU Software and SpaceX passed. SpaceX ran the ITU software using an NCO Of one as it has operated This constellation. It already has 1900 satellites up there. As it has operated this constellation, As it plans to continue using Its operation, which it put Into the record here, And it passed. SpaceX made its input Files available to Anyone who wanted them. You can get the ITU validation software Off the internet. Everyone has run it. SpaceX has run it. DISH's Paid consultant ran it. They all come up With a passing grade. Their primary Argument, Judge Wilkins, And I think this is responsive to your question That you were asking earlier, Their primary argument was Well, we don't believe that SpaceX Is actually going to operate this At NCO one, that they need To do more than one beam at a time In order to provide enough Coverage. We think they're actually going to use Three, five, or ten beams at a time. And so commission, you Should discredit that evidence. Well, SpaceX came back and said This is how we've always operated it. SpaceX accepted the Condition that DISH proposed. DISH proposed that the license Be conditioned on an NCO Of one. SpaceX said that's How we operate it, so sure. Then the FCC put it Into the license order. If SpaceX at any point In time actually deviated From that and ran it At an NCO of three, five, Seven, or ten, at which Point there will be detectable Evidence of that, well, of course The commission can come in and Levy whatever regulatory Actions it wants to take Based on SpaceX breaching The conditions of the license That it has issued. And so there isn't This isn't a situation where There isn't any recourse if SpaceX actually violates Its obligations. The last thing I'll say is Judge Katsas, I think I believe you had asked, is this Really kind of unprecedented? Is there anything else like this? The commission has approved an Amazon NGSO constellation Of 3,236 Satellites, which is Bigger than the 2,800 modification It issued here and in the range Of the 4,400 total. It's also approved a OneWeb Non-geostationary satellite Orbit of about 2,000 satellites. And almost all Of these, by the way, have steerable beams And there are several other Providers at varying levels of Satellites that Have either obtained approval Or are seeking approval. The point is, they've all been approved Using the ITU Software. And as Mr. Carr said, There hasn't been any evidence And these are all obviously At the application stage, they're all predictive Judgments. And so the only question Is, what predictive model Do you use? The FCC Has decided to adopt the international Consensus model, the state Of the art software from the ITU. And it has to be some Predictive model. Either The FCC uses the ITU model Or it allows people to come in With ad hoc studies In every case. It is quite a reasonable judgment that the commission Made in the 2017 rulemaking To use the State of the art software and not Invite ad hoc studies. Of course, if you change If you tweak the algorithm, if you Change the locations from The ITU software, anyone Through trial and error can create A fail rating. You could look at any Of the approved systems, By the way, and if you Actually did what DishesPay Consultant did, if you took ITU's algorithm But changed the algorithm so it wasn't Using the worst-case geometry, which Is designed to maximize interference, by the way, But if you replace that with your own Hand-picked location, you could Create a fail rating on virtually any system. But, of course, that's not how it's Supposed to work. FCC Made the very considered and reasoned Judgment in its expertise that the ITU Software was the best way to go. And if there is actual Interference on the ground After they're operating, again, this is All at the predictive stage, so there will never be evidence One way or another. You just have to pick A predictive model. They picked the best One. If it turns out As you Talked about, that there is interference That, for example, SpaceX is operating At NCO of 5 or 10, Not 1, as they had promised, Of course the commission can step in. But there's no evidence, Of course, that SpaceX is going to Operate it at anything other Than what it is committed to, which is NCO Of 1, which has been validated By the ITU software, Which SpaceX has made the input files, Which DISH itself ran under the same Software and came out with the same Pass rating, and now we're Just awaiting the ITU approval. And, by the way, your honors, just as an Empirical matter, we're not talking about years Ahead for the ITU approval. This same Partial waiver that was granted here Was granted with the first Tranche of 1,584 satellites That Ms. May mentioned in SpaceX, That's the first modification, That approval, the first Batch of that approval came about 13 months after SpaceX submitted. By the way, it's all been approved, That first tranche, which was through the partial Waiver the first time Along ITU said Validated everything. The submission For the ITU approval here was Submitted in February 2021, So if they take The same 13 months or a little Over a year, we could have an answer. Obviously, nobody knows because it's In the ITU's control, but just to give you some Sense, we could have an ITU Validation within a couple Months. So I know I'm way over my time, So I'll stop there unless You have questions. All right. Judge Katsas, Judge Walker? All right. Thank you. All right. Mr. Jay, You've had no time left. I'll give you two minutes. Thank you very much, Your Honor. I'll just take A few points, a couple on standing and a Couple on the merits. On standing, Let me do one on the balance group, Which is just to Make clear that In Sorenson, The organization that couldn't identify Any members was trying To rely on members Of its email list or People who liked its Facebook page. That is not what the balance group is doing here. Membership involves Actual participation in the balance group's activities. I think that was actually demonstrated In the excerpt in the FCC's addendum, and The suggestion that The kickoff meeting was the First day on which the balance Group had members is refuted by our Declaration, which explains that Both Dr. Galuzzi and Dr. Bedilli were members Before the notice of appeal was Filed, which was months before The so-called kickoff meeting. Second, on bias at standing, I want to underscore The point about cost and Note that the costs Detailed at pages 29 to 30 Of our addendum of the Dankberg Declaration. It's not just the It's not just the cost of Operating the satellites or the cost that would Be incurred if there were a collision. It's also The difficulty in finding launch windows And the increased costs associated With launch windows from the crowding Of low-earth orbit, both with satellites And with debris if there is a collision. As I noted, the Bowley and Byers article suggests that a single collision Could make low-earth orbit unusable. On the merits, The other side suggested that the court Apply the NEPA regs as written. That's exactly what we're asking the court to do. We want to apply the May standard, which As the commission itself said, is a safeguard Because its categorical exclusion Is so broad. The May standard Is a relatively low bar. For Illumina, On the point about Illumina Not being a radical, That's certainly correct, but Illumina Is a surface on which radicals can destroy Ozone, and a particle of Illumina Can stay in the stratosphere For three to five years. So one radical can Destroy a million Particles of ozone, but then Illumina remains there for a lengthy Period of time. None of that Is addressed in the FCC's order. Neither were a number of the distinctions that my Friends sought to draw today, you know, comparing One fraction to another. None of that's in The FCC's reasoning, and this kind of scientific Judgment is what an EA would be for. And then finally, on light pollution, I just want to underscore That as the commission acknowledges In note 351 of the order, They haven't achieved their mitigation goal Even as to making Satellites not visible to the naked Unassisted eye, and our Light pollution argument is broader Than that, because it also includes sky glow And the interference with astronomy. That is not speculative. That is not, you know, based on some kind of Different denominator. It is documented right Now, and there are pictures in the record that you can see. Thank you. Unless the court has any further questions, thank you very much. We are adjourned. Thank you. Thank you, counsel. And counsel, Mr. Michelopoulos, I'll give you Also two minutes. Thank you, your honors, and I have rather violently Extricated the Sources from the Joint Appendix for Efficiency, so I'll address first Mr. Carr's points. First, Mr. Carr Drew a distinction between the predictive Evidence we Have presented, and Empirical evidence that may Transpire In the future, and the first point, of course, I would like to make about that Is back to what the FCC Said in 2000, paragraph 191, it is imperative The FCC said that Compliance be verified Ex ante during the licensing Process. That, of course, will be After the fact. But beyond that, As for Mr. Carr's intimation That the FCC will closely look At this empirical evidence And will somehow accord it Greater status than the Expert evidence we have Submitted, let me read to you From the order itself, and That's paragraph 41 of The order. Additionally, The FCC said, we Decline to condition This grant of modification To require that if any DBS operator notifies SpaceX that its system is Causing actual interference in Access of the certified limit, SpaceX should be required To immediately remedy the Interference. No, we Decline that. We find this is Unnecessary, given the Existing condition That SpaceX operations Comply with The limits. The limits that There will not be a finding about until The ITU gets around to it. So, again, this shows a lack of Any interest in treating The empirical evidence of the future Any different than the Expert evidence Of the present. Then, and That goes to your question, Judge Katsos, about the System. This is a complex System. Is this something Unprecedented? And the answer From Mr. Carr was No, the ITU has carefully Looked at all Sort of systems. That's not what The record shows. And Joint Appendix 176, I believe, Shows that The This Constellation is complex. It has interleaving orbits, it has Several inclination angles, And it's exactly the kind of System that the ITU software Was not geared To be able to handle. This is undisputed evidence from Our expert witness. And then Mr. Carr Said, and let me Move to the second page from the Joint Appendix, That, well, if This has a problem With the submission To the ITU, it can always Go to the ITU. But what Mr. Carr was talking about Was this becoming some part A member of a working Party that would look at those Issues and software Changes for the future. The ITU hears only from Administrations. If we were to go to the ITU in response to the Submission made by the FCC and said, Hello, we are this. We're not an administration, but Because our administration has a conflict Of interest, please hear us. We would be politely, Or perhaps not, shown the door. And then There was A question Asked of Mr. Carr As to whether we are right About the use of the ITU software. Because we said we used it And Mr. Carr disputed that. So I want to read to you From the Joint Appendix. This is, again, undisputed Expert evidence Submitted by this. So We said Recommendation ITU-R-15032 The applicable recommendation does not handle Complex constellations. But by Using a feature In the Transfinite Visualized EPFT software That's the ITU-approved software. It is possible for the user To set These real-world parameters Which improve significantly The accuracy of the assessment. So we did use The ITU-approved software. We just said Set real-life locations. Now, to the arguments of Council for bystanders. I think we're going to have to Leave it there, Mr. Michalopoulos, In the interest of time. All right. Thank you very much. If you have your arguments, we'll take them. Thank you very much.
judges: Wilkins, Katsas, Walker